Date signed March 30, 2007



**THOMAS J. CATLIOTA**
**U. S. BANKRUPTCY JUDGE**

IN THE UNITED STATES BANKRUPTCY COURT
DISTRICT OF MARYLAND
at GREENBELT

| | | | |
|---|---|---|---|
| In Re: | * | | |
| Jeffrey F. Moore, | * | Case No. | 05-28378-TJC |
| | * | Chapter | 7 |
| Debtor. | * | | |
| ************************************** | * | | |
| Ultra Litho, PYT, Limited, | * | | |
| | * | | |
| | * | | |
| Plaintiff, | * | Adv. No. | 05-9082 |
| vs. | * | | |
| Jeffrey F. Moore, | * | | |
| | * | | |
| | * | | |
| Defendant. | * | | |

**MEMORANDUM OF DECISION**

Before the Court is the Complaint to Determine Dischargeability of Debt, filed by

Plaintiff Ultra Litho, PYT, Limited ("Ultra Litho") against Jeffrey F. Moore (the

"Debtor" or "Mr. Moore").  The Court conducted a trial on the complaint on December

13, 2006.  The parties filed post-trial briefs, and closing arguments were held on January

19, 2007.  For the reasons stated herein, the Court determines that a debt of $127,031.25

from Mr. Moore to Ultra Litho is excepted from discharge under 11 U.S.C. §

523(a)(2)(A).

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334, 157(a),

and Local Rule 402 of the United States District Court for the District of Maryland.  This

is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I).  The following constitutes the

Court's findings of fact and conclusions of law.

## I.      FINDINGS OF FACT

The Debtor filed a petition under Chapter 7 of the Bankruptcy Code on August

17, 2005.   On November 11, 2005, Ultra Litho filed the instant complaint to determine

the dischargeability of a debt under 11 U.S.C. § 523(a)(2)(A) and (a)(2)(B).[1]

The Debtor founded International Graphic Services, Inc. ("IGS") in 1993.  At all

relevant times herein, he was its sole shareholder and President.  While IGS was in

operation, Mr. Moore may have consulted with others about various decisions from time

to time, but he was the sole decision-maker for IGS.  Mr. Moore controlled the

expenditure of funds by IGS and had knowledge of the financial condition and status of

IGS at all times.

IGS was in the business of brokering sales of printing presses.  It brokered

transactions ranging in size from small presses to large sophisticated machines with

purchase prices in excess of $1 million.  It employed various strategies for consummating

---

[1]  The complaint also asserted claims of nondischargeability under 11 U.S.C. §§ 523(a)(4) and (a)(6).
However, Ultra Litho announced in court that it was withdrawing its claims that the debt was
nondischargeable under Sections 523(a)(4) and (a)(6).

sale transactions.  For example, at times, it would contract directly to buy a press and then enter into a second contract to resell the press to the ultimate buyer/user.  However, it never was able to establish or obtain a loan or line of credit from a bank or financial institution.  IGS had no means of borrowing money at the time of the transaction described herein that gave rise to the claims in the complaint.

IGS commenced business in 1993.  Its best year was 1999, when it sold presses with an aggregate value of approximately $7.8 million.  IGS's business volume dropped precipitously after 1999.  It ceased doing business completely in 2002.

1.     **The Initial Agreements to Sell the Press: The IGS/Jannes Sale Agreement and the IGS/UltraLitho Sale Agreement**.

In 2000, the Debtor learned that an individual named Nicholas Jannes and an affiliated entity, Black Box Collotype, Inc., (collectively "Jannes") were in the market for a 7-color Heidelburg printing press.  The Debtor went in search of a seller of a Heidelburg 7-color press. He learned that Ultra Litho was selling such a press.

Ultra Litho is a printing company that is located in Johannesburg, South Africa.  It is owned 50 percent by Colin Finck and 50 percent by Hans Kieslich.  In 2000, it decided to purchase a 10-color printing press from KBA North America, Inc. ("KBA").  In order to purchase the new press, Ultra Litho needed to sell its existing 7-color 1994 Heidelburg press, Serial No. 536603, along with related equipment (the "Press") to make space for the new press[2] and because Ultra Litho needed the funds from the sale to help pay for the new press.  Ultra Litho determined that, for competitive reasons, it would not sell the Press to any printing company in South Africa.

---

[2] The Press is 60 feet in length.

In order to broker a sale of the Press from Ultra Litho to Jannes, IGS, through Mr. Moore, entered into a contract to sell the Press to Jannes pursuant to a contract signed on or about September 12, 2000 (the "IGS/Jannes Sale Agreement").  Plaintiff's Exhibit ("PX") 2.  The IGS/Jannes Sale Agreement was contingent on IGS obtaining ownership and clear title to the Press.  Id. at p. 2.  The purchase price in the IGS/Jannes Sale Agreement was $1,650,000.  Id. at p. 3.  Under the agreement, Jannes was required to pay to IGS a deposit of $412,500 (the "Jannes Deposit") as follows: (1) an immediate $50,000 "good faith deposit fully refundable" at the time of the execution of the IGS/Jannes Sale Agreement; and (2) $362,500 that was paid after Jannes inspected the Press in South Africa.  Id. at p. 4.  Jannes paid the Jannes Deposit to IGS in accordance with the IGS/Jannes Sale Agreement.  Jannes did not require that IGS deposit the Jannes Deposit in a segregated account.   Mr. Moore signed the IGS/Jannes Sale Agreement on behalf of IGS.

Subsequently, the Debtor negotiated, on behalf of IGS, the purchase of the Press from Ultra Litho.  Ultra Litho and IGS entered into a contract for the sale of the Press to IGS, which was executed on or about October 20, 2000 (the "IGS/Ultra Litho Sale Agreement").  Under the IGS/Ultra Litho Sale Agreement, IGS agreed to buy the Press for $1,200,000.  PX 1 at p. 2.  The IGS/Ultra Litho Sale Agreement required IGS to pay Ultra Litho a deposit of $120,000, which it did from the proceeds of the Jannes Deposit. Mr. Moore signed the IGS/Ultra Litho Sale Agreement on behalf of IGS.  The parties agreed that Mr. Moore did not provide a copy of the IGS/Jannes Sale Agreement to Ultra Litho or disclose to Ultra Litho the amount of the purchase price in the IGS/Jannes Sale

4

Agreement, but he did disclose that Jannes was the ultimate buyer and end user of the Press.

### 2.    The Failure of the Initial Transactions to Close.

The transactions stalled for various reasons.  In the Spring of 2001, it became apparent to Mr. Finck and Mr. Kieslich that the proposed sale of the Press to IGS was not going to be consummated and they needed to conduct further negotiations to complete the transaction.

The reason the initial transactions failed was the subject of dispute.  Mr. Finck testified that the sale between Ultra Litho and IGS did not close because IGS did not tender the letter of credit as required by the IGS/Ultra Litho Sale Agreement.  Both he and Mr. Moore testified that Mr. Moore repeatedly told Ultra Litho that Jannes could not produce its letter of credit that would have enabled IGS to obtain its own letter of credit in favor of Ultra Litho.  No one suggested that Ultra Litho had anything to do with the failure of the transactions to close.

Without regard to whether IGS or Jannes was the primary reason for the failure to close, it appears from a review of the IGS/Ultra Litho Sale Agreement and the IGS/Jannes Sale Agreement that the initial transactions failed to close because of timing differences in the obligations of IGS (under the IGS/Ultra Litho Sale Agreement) and Jannes (under the IGS/Jannes Sale Agreement).  Specifically, under the IGS/Ultra Litho Sale Agreement, IGS was required to pay Ultra Litho the balance of the purchase price ($1,080,000) "by irrevocable letter of credit, payable upon removal of machine."  PX 1 at p.2.  Further, IGS was required to remove the Press from Ultra Litho's premises "no later

than February 16, 2001." Id.  Accordingly, to close on the IGS/Ultra Litho Sale

Agreement, IGS was required to post a $1,080,000 letter of credit by February 16, 2001.

IGS had no source of financing from which it could obtain a letter of credit in

favor of Ultra Litho based on its own credit, and IGS depended on Jannes's payment of

its obligations under the IGS/Jannes Sale Agreement to perform its obligations to Ultra

Litho under the IGS/Ultra Litho Sale Agreement.  But the timing of Jannes's obligations

to IGS under the IGS/Jannes Sale Agreement did not allow IGS to do so.  Specifically,

after Jannes paid the Jannes Deposit to IGS, Jannes was required to make additional

payments to IGS under the following schedule: (1) $412,500, when the Press was

delivered to port; (2) $577,500, when the Press was delivered to Jannes's facility; and (3)

$247,500, after installation, a satisfactory print and registration test acceptable to Jannes

and training were completely finalized.  PX 2 at p. 4.  Although, as Mr. Moore points out,

it appears that Jannes was required to secure its obligations to IGS with a letter of credit

in favor of IGS, it does not follow that the letter of credit would  affect the timing of the

payment of Jannes's obligation, only the certainty of it.  Apparently, the parties were not

able to bridge these timing differences and the transactions stalled.

> **3.      The Resolution: The Press Agreement and the Ultra Litho/IGS
> Settlement Agreement.**

Ultra Litho, Jannes and KBA, in collaboration with IGS, entered into negotiations

in order to resolve all of their differences in an effort to consummate the sale of the Press.

The parties reached a consolidated agreement through the execution of two interrelated

agreements: (1) the Press Agreement (the "Press Agreement") which, as amended, was

not finally executed until all four parties executed the Amendment to the Press

Agreement on June 11 and 13, 2001; and (2) a second agreement memorializing a

separate agreement between Ultra Litho and IGS (the "Ultra Litho/IGS Settlement Agreement"). Mr. Finck conducted these negotiations on behalf of Ultra Litho and Mr. Moore conducted them on behalf of IGS.

Under the Press Agreement, Ultra Litho agreed to sell the Press to KBA "through contracts and agreements entered into separate from [the Press A]greement". PX 4 at p. 1.[3] In turn, KBA agreed to sell the Press to Jannes "under the terms and conditions set forth in the attached Exhibit A." Id.[4] KBA agreed to credit Jannes the amount of $412,500 previously paid as the Jannes Deposit against a total purchase price of $1,650,000. Under the Press Agreement, Jannes would pay into escrow the amount of $1,237,500, which represented the Jannes purchase price of $1,650,000 less the Jannes Deposit. Id. The Press Agreement also stated that the parties acknowledge that "Ultra Litho and IGS have separately agreed to a private settlement" of the prior transaction. Id.

The terms of the Press Agreement agreed to by Ultra Litho, KBA and Jannes. The Press Agreement is not dated, although the face of it reflects that it was agreed to in principle on or after May 14, 2001.[5]

Mr. Moore, on behalf of IGS, initially refused to sign the Press Agreement. As explained in a letter dated May 18, 2001 (the "May 18 Letter"), PX 21, from IGS's attorney, Jeffery Axelson, to Mr. Finck, IGS required that a broad release must be

---

[3] The parties did not submit into the record the separate "contracts and agreements" between Ultra Litho and KBA. Accordingly, while it is clear in the Press Agreement that Jannes paid $1,650,000 to KBA for the Press, against which it received a credit for the Jannes Deposit, for a net cash payment under the Press Agreement of $1,237,500, it is not clear from the Press Agreement how much Ultra Litho received for the Press. The testimony of Mr. Finck established that Ultra Litho received the $1,237,500 that Jannes deposited in escrow under the Press Agreement, plus it retained the $120,000 it had received as a deposit from IGS pursuant to the IGS/Ultra Litho Sale Agreement, as authorized by the Ultra Litho/IGS Settlement Agreement. In addition, Ultra Litho was supposed to receive the $127,031.25 under the Ultra Litho/IGS Settlement Agreement, which it never received.

[4] The parties did not submit into the record the referenced Exhibit A.

[5] See reference in the Press Agreement to a related KBA/Jannes contract dated May 14, 2001. PX 4 at p.1.

inserted into the Press Agreement, under which Ultra Litho, KBA and Jannes each release IGS and its "officers, directors, stockholders [and] employees," among others. PX 21 at p.1.  As explained by Mr. Axelson in the May 18 Letter, the "specificity of releasing IGS . . . is paramount to IGS participation in this resolution of the transaction." Id.  Thereafter, once their was agreement on the release language, all four parties executed an Amendment to the Press Agreement on or about June 11 and 13, 2001.  Mr. Moore signed the Amendment to the Press Agreement on behalf of IGS.

The "private settlement" between Ultra Litho and IGS referred to in the Press Agreement was memorialized in the Ultra Litho/IGS Settlement Agreement.  PX 3.  The Ultra Litho/IGS Settlement Agreement was signed by Ultra Litho and Mr. Moore, on behalf of IGS, on June 4, 2001.[6]  The recitals of the Ultra Litho/IGS Settlement Agreement state that:

> WHEREAS, by contract dated September 8, 2000, Nicholas G. Jannes ("Jannes") previously negotiated with IGS for a certain 1994 Heidelberg Speedmaster CS 102 SLLX, serial number 536603, seven color, forty inch sheetfed offset press with double coating towers (the "Press"), which Press was to be sold to IGS by Ultra Litho (collectively the "Prior Transaction"); and
>
> WHEREAS, Jannes previously paid to IGS the sum of four hundred twelve thousand five hundred dollars ($412,500) toward the purchase of the Press, and
>
> WHEREAS, the Prior Transaction for the Press has encountered difficulties, but Jannes still desires the purchase the Press, and the parties to this agreement all desire to complete the transaction described herein, and
>
> WHEREAS, the parties have executed an Agreement (the "Press Agreement") to release each other from the Prior Transaction and provide for the purchase of the press by KBA North America, Inc.,

---

[6] When the Ultra Litho/IGS Settlement Agreement was executed, the parties handwrote in the date of June 4, 2000.  See PX 3 at p. 3.  At trial, both sides agreed the correct date was June 4, 2001.

> Sheetbed Division ("KBA"), a Delaware corporation which has executed a
> contract with Jannes; and
>
> WHEREAS, IGS and Ultra Litho wish to settle their differences with
> regard to the Contract by IGS and <u>the holding of the deposit from Jannes
> by IGS and allow payment to IGS from said deposit</u>; and
>
> WHEREAS, paragraph 3 of the Press Agreement provides for a private
> Settlement between Ultra Litho and IGS of the Prior Transaction;

PX 3 at p.1 (emphasis added).  Under the Ultra Litho/IGS Settlement Agreement, the

parties agreed that "the terms of the Press Agreement would be carried out by Ultra Litho

and IGS." PX 3 at p.1.  Further the parties agreed that the Jannes Deposit would be

resolved as follows: (1) Ultra Litho acknowledged it previously received $120,000

pursuant to the IGS/Ultra Litho Sale Agreement; (2) IGS could keep $160,000 as

consideration for services IGS provided to Ultra Litho and Jannes (although it was

required to pay $10,000 toward the $15,468.75 interest that was required to be paid

pursuant to paragraph 2 of the Press Agreement, <u>see</u> PX 4 at ¶ 2); and (3) of the

remaining $132,500 ($412,500 minus $120,000 minus $160,000), $5,468.75 was to be

paid as the balance of the $15,468.75 interest that was required to be paid pursuant to

paragraph 2 of the Press Agreement, <u>see</u> PX 4 at ¶ 2, and IGS was to wire $127,031.25

into the bank account of Ultra Litho in accordance with wiring instructions contained in

the agreement.  PX 3 at p. 1-2.

The Ultra Litho/IGS Settlement Agreement was prepared by Mr. Axelson, who,

as stated above, was counsel for IGS.  Mr. Axelson prepared it based on a summary sheet

sent to Mr. Moore by Mr. Finck on May 15, 2001, some time after Mr. Finck and Mr.

Moore agreed in a phone conversation on how they would split up the Jannes Deposit.

Mr. Axelson sent the Ultra Litho/IGS Settlement Agreement to Mr. Finck for signature

under cover of the May 18 Letter.  The May 18 Letter states that Mr. Axelson was sending "a draft of an agreement between Ultra Litho and IGS and concerns the transfer of the monies and a further release."  PX 21 at p.1 (emphasis added).  The draft agreement that was sent by Mr. Axelson with the May 18 Letter is not different from the final Ultra Litho/IGS Settlement Agreement insofar as the recitals or operative provisions are concerned.  Mr. Moore "probably" read and reviewed the May 18 Letter when it was sent to Mr. Finck.  Mr. Finck read it when he received it on or about May 18, 2001.

Prior to agreeing to the terms of the Press Agreement and the Ultra Litho/IGS Settlement Agreement, Mr. Finck verified with both Jannes and Mr. Moore that Jannes had delivered the Jannes Deposit to IGS, although he did not specifically ask Mr. Moore whether IGS had spent it.  Mr. Moore did not tell Ultra Litho or Jannes or anyone else that IGS had spent the Jannes Deposit.

As established by, among other things, the testimony of Mr. Finck, at the time Ultra Litho entered into the Press Agreement, the Ultra Litho/IGS Settlement Agreement and the Amendment to the Press Agreement, Ultra Litho believed that IGS continued to hold the Jannes Deposit and would wire it upon resolution of the two agreements based on: (1) the verification by both Jannes and Mr. Moore that the Jannes Deposit had been delivered to IGS; (2) Mr. Moore did not say he had spent the Jannes Deposit when Mr. Finck called him to verify that IGS received the deposit; (3) in that conversation, Mr. Moore and Mr. Finck specifically negotiated how they would split up the Jannes Deposit between IGS and Ultra Litho, and Mr. Moore knew that was Mr. Finck's purpose; (4) the language in the Ultra Litho/IGS Settlement Agreement that the agreement resolved "the holding of the deposit from Jannes by IGS and allow payment to IGS from said deposit,"

10

PX 3 at p.1; and (5) the language in the May 18 Letter from Mr. Axelson, IGS's counsel, that the agreement concerns "the transfer of the monies" from IGS to Ultra Litho. PX 21 at p.1.

Ultra Litho viewed the Press Agreement and the Ultra Litho/IGS Settlement Agreement as one and the same transaction, and that, in order for the Press Agreement to occur, there had to be a corresponding agreement concerning the Jannes Deposit between Ultra Litho and IGS.  That corresponding agreement between IGS and Ultra Litho was reached in the phone conversation between Mr. Moore and Mr. Fink described above before the Press Agreement was finalized. Ultra Litho would not have gone forward with the Press Agreement if IGS had not agreed to enter into the Ultra Litho/IGS Settlement Agreement.  Ultra Litho would not have gone forward with the Press Agreement or the Ultra Litho/IGS Settlement Agreement if it had known that IGS had spent the Jannes Deposit.  The foregoing facts were established by the testimony of Mr. Finck, as well as by inferences drawn from language of the pertinent documents and the timing of their execution.

      **4.**       **IGS's Inability to Perform**.

IGS never paid the $127,031.25 to Ultra Litho.  By the time Mr. Moore executed the Ultra Litho/IGS Settlement Agreement and the Press Agreement on behalf of IGS, IGS had spent the entire Jannes Deposit.  IGS did not have funds in its bank accounts that it could use to pay Ultra Litho the $127,031.25.  IGS had no line of credit or other borrowing facility available to it.

According to Mr. Moore, at the time, the market for the sale of presses had declined precipitously because the manufacturing sector was in a full recession and

companies stopped making capital investments.  In June, 2001, at or about the time Mr. Moore executed the Ultra Litho/IGS Settlement Agreement and the Amendment to the Press Agreement on behalf of IGS, Mr. Moore opened a new bank account at Bank of America.  He could not remember if the reason the account was opened was because the existing account had been garnished.  It is safe to say, however, that Mr. Moore was concerned with garnishments and attachments at the time.

IGS had a judgment entered against it just prior to Mr. Moore executing the Ultra Litho/IGS Settlement Agreement on behalf of IGS.  The judgment was in the amount of approximately $73,000 by Host Communications ( "Host") from an action commenced in 2000.  IGS previously had a prior judgment entered against it that resulted in its assets being attached.  Thus, Mr. Moore had knowledge of what actions creditors can take to exercise remedies upon obtaining a judgment.  At the time of entering into the Ultra Litho/IGS Settlement Agreement, Mr. Moore expected that Host similarly would attempt to attach or otherwise seek to obtain IGS's assets in pursuit of being paid.  At that time, IGS also was the subject of a number of lawsuits by parties seeking to recover deposits or asserting other claims.  These lawsuits were commenced as early as 1999 and 2000.  The plaintiff in one other suit, in Kentucky, was on the verge of obtaining a judgment against IGS.

Mr. Moore testified that, at the time he executed the Ultra Litho/IGS Settlement Agreement on behalf of IGS, IGS held title to three presses in storage: a Heidelburg 2-color press, a Heidelburg 1-color press, and a Hoshimoto press.  IGS also had two other small presses.  Mr. Moore, however, had no documents or records that supported or

established that IGS owned these assets.[7]  He testified that he had advertised these presses for an aggregate sale price of about $250,000 - $275,000.  IGS also had a dryer that Mr. Moore said was worth about $5,000 and a cleaning machine worth about $10,000, and smaller parts worth a few thousand dollars.  Most, if not all, of these presses and other assets were subject to liens for storage fees.  Mr. Moore testified that at the time he executed the Ultra Litho/IGS Settlement Agreement, he hoped to be able to sell these presses and assets and generate enough proceeds to pay the $127,031.25 to Ultra Litho.  However, the presses and assets were sold at various sheriff sales or similar creditor auctions or taken by creditors to pay off liens for storage fees, judgments or other unpaid debt obligations of IGS.  The two Heidelburg presses, and other equipment, were taken by Host toward satisfaction of its judgment and storage fees.  The Hoshimoto was taken by Rutger Holtzerman, a German company, which gave IGS a credit of about $80,000 toward satisfaction of its outstanding debt and satisfied the storage fees.

IGS did not obtain any net proceeds or recovery from these transactions.  Further, Mr. Moore knew that, even if he had been able to sell these assets, as opposed to losing them through creditor remedies as actually occurred, a number of other creditors had to be paid from the proceeds before Ultra Litho could be paid.  There was no balance sheet or other financial information that reflected the amount of the liabilities of IGS at the time of the transaction.  Mr. Moore could not remember many of the balances of the outstanding liabilities at that time.  It appeared from cross-examination, however, that

---

[7] IGS was only able to produce bank statements, records and other documents from 1996 to early 2000 and from late 2001, forward, with some minor exceptions.  Mr. Moore's explanation for the documents missing from 2000 through late-2001, the time period that is relevant to this case, is that they were lost in a move.  Accordingly, there is no documentary record of where the Jannes Deposit was deposited or what expenditures were made from it.  Similarly, there are no documents that establish what assets IGS held during this period or what liabilities it owed.

taking into account the following claims alone, the balance of the liabilities substantially exceeded $250,000 - $275,000: (1) Host held a judgment for $73,000; (2) there were outstanding storage fees of at least $25,000 against the presses; (3) an entity named Whitehorse held a claim of between $60,000 - $80,000; (4) Rutger Holtzerman, the German company that took the Hoshimoto press and gave a credit of about $80,000 against the outstanding debt, was still owed, after the credit, over $100,000 according to deposition testimony given by Mr. Moore in 2003.[8]  Accordingly, by Mr. Moore's own testimony, the foregoing claims alone ranged from $340,000 - $360,000, before taking into account any credit the creditors gave for the equipment they received. This amount substantially exceeds the value Mr. Moore attributed to the presses and other equipment.

IGS could not pay its rent, and Mr. Moore moved its operations from leased space to his home.  He could not remember when that occurred, except that it occurred in "warm weather." He was not sure if that meant in the "warm weather" of 2001 (i.e., about the time of the Press transactions) or the spring of 2002.

**5.    Ultra Litho Action Against Mr. Moore.**

Ultra Litho sued Mr. Moore for breach of the agreement and fraud in the Circuit Court for Montgomery County, Maryland.  That suit was stayed by operation of the automatic stay upon the filing of Mr. Moore's bankruptcy case.

**II.    CONCLUSIONS OF LAW**

Ultra Litho contends that it is owed $127,031.25 by Mr. Moore based on misrepresentations he made.  Ultra Litho contends that Mr. Moore misrepresented that IGS continued to hold the Jannes Deposit, first by omission in his conversation with Mr.

---

[8] At trial, Mr. Moore could not remember how much Rutger Holtzerman was owed, although he admitted that his memory at the time of his deposition in 2003 would have been better on this issue than at the time of trial.

Finck, and later by affirmative written misrepresentations in the Ultra Litho/IGS Settlement Agreement and the May 18 Letter. Ultra Litho contends that these misrepresentations, when coupled with meeting the other requirements of Section 523(a)(2)(A), are sufficient to establish the nondischargeability of a debt under Section 523(a)(2)(A).

Under a second theory, Ultra Litho contends that the statement in the Ultra Litho/IGS Settlement Agreement of "the holding of the deposit from Jannes by IGS" is a statement "respecting . . . an insider's financial condition" and therefore meets the requirements of Section 523(a)(2)(B). Ultra Litho contends that the other elements of Section 523(a)(2)(B) are met and therefore the Court should determine that a debt of $127,031.25 from Mr. Moore to Ultra Litho is nondischargeable under that section. Mr. Moore contends that neither the Ultra Litho/IGS Settlement Agreement nor the May 18 Letter is a "statement . . . respecting an insider's financial condition" and therefore cannot provide the basis for a claim under Section 523(a)(2)(B).

For the reasons stated herein, the Court determines that Mr. Moore misrepresented that IGS continued to hold the Jannes Deposit, first by omission in his conversation with Mr. Finck, and later by affirmative written misrepresentations in the Ultra Litho/IGS Settlement Agreement and the May 18 Letter. In particular, the statements in the Ultra Litho/IGS Settlement Agreement of "the holding of the deposit from Jannes by IGS" and the "payment to IGS from said deposit," as well as the statement in the May 18 Letter that the agreement concerns "the transfer of monies," are affirmative misrepresentations by Mr. Moore and IGS that IGS continued to hold the Jannes Deposit, when in fact Mr. Moore knew that the Jannes Deposit had been spent.

Further, the Court finds and concludes that the other elements of Section 523(a)(2)(A) are met.  Accordingly, the Court concludes that a debt of $127,031.25 from Mr. Moore to Ultra Litho is nondischargeable under Section 523(a)(2)(A).  Finally, the Court agrees with Mr. Moore's contention that neither the Ultra Litho/IGS Settlement Agreement nor the May 18 Letter is a "statement . . . respecting an insider's financial condition" and therefore cannot provide the basis for a claim under Section 523(a)(2)(B).

"The Bankruptcy Code has long prohibited debtors from discharging liabilities incurred on account of their fraud, embodying a basic policy animating the Code of affording relief only to an honest but unfortunate debtor."  Cohen v. De La Cruz, 523 U.S. 213, 217 (1998).  This policy is codified in Section 523 which provides in pertinent part:

> (a) A discharge under section 727, 1141, 1228(a), 1228(b),
> or 1328(b) of this title does not discharge an individual
> debtor from any debt-
>                         ***
> (2) for money, property, services, or an extension, renewal,
> or refinancing of credit, to the extent obtained by-
> (A) false pretenses, a false representation, or actual fraud,
> other than a statement respecting the debtor's or an insider's
> financial condition;

11 U.S.C. § 523(a)(2)(A).  While exceptions to discharge are narrowly interpreted to protect the purpose of providing debtors a fresh start, it is equally important to ensure that "perpetrators of fraud are not allowed to hide behind the skirts of the Bankruptcy Code."  Foley & Lardner v. Biondo (In re Biondo), 180 F.3d 126, 130 (4th Cir. 1999).  To prevail on a claim that a debt should be excepted from discharge, a creditor must prove all the elements of Section 523(a)(2) by a preponderance of the evidence.  Grogan v. Garner, 498 U.S. 279, 291 (1991).

1.      **Section 523(a)(2)(A) Predicate: Obtaining Money, Property, Services or an Extension, Renewal or Refinancing of Credit.**

Section 523(a)(2) initially requires that the debt be "for money, property, services, or an extension, renewal, or refinancing of credit. . . ."  A threshold inquiry under Section 523(a)(2)(A) is whether the Debtor received value as a result of the fraudulent conduct.  Section 523(a)(2)(A) does not except "simply any debt incurred as a result of fraud but only debts in which the debtor used fraudulent means to obtain money, property, services, or credit."  Nunnery v. Rountree (In re Rountree),  478 F.3d 215, 219 (4th Cir. 2007) ("We hold that the plain language of 11 U.S.C. § 523(a)(2)(A) and the Supreme Court's interpretations of that language require that the debtor must obtain something through fraud for the exception to apply."  Id. at 223.).  Section 523(a)(2)(A) covers the primary debtor-creditor relationship "through express language extending its scope to debts incurred through the direct acquisition of value."  Biondo, 180 F.3d at 131.  Additionally, "secondary debt transactions" including extensions, renewals, and refinancing are within the purview of Section 523(a)(2)(A).  Id. (citing 11 U.S.C. § 523(a)(2)(A)).  "The terms collectively used in § 523(a)(2) are thus broad enough to account for virtually every type of secondary debt transaction."  Biondo, 180 F.3d at 133.

Mr. Moore contends that he did not obtain any "money, property or services, or an extension, renewal or refinancing" from Ultra Litho, and therefore Ultra Litho cannot establish the necessary factual predicate for the application of Section 523(a)(2).  This Court disagrees.

As an initial matter, applying the leading case authority in this circuit, IGS obtained from Ultra Litho an "extension . . . of credit," as that phrase is used in Section 523(a)(2), under the Ultra Litho/IGS Settlement Agreement.  At the time of the execution

of the Press Agreement and the Ultra Litho/IGS Settlement Agreement, Ultra Litho and

IGS had an existing creditor-debtor relationship. This is because IGS was obligated to

pay Ultra Litho $1,080,000 ($1,200,000 minus the $120,000 deposit paid) for the Press

under the original IGS/Ultra Litho Sale Agreement. As stated in Biondo,

> Not every commercial transaction results in a debtor-creditor
> relationship, as exemplified by the immediate, and theoretically
> simultaneous, exchange of cash for goods. See, e.g. Bass v. Stopler,
> Koritzinsky, Brewster & Neider, S.C., 111 F.3d 1322, 1332 n.4 (7th
> Cir. 1997) (Bauer, J., dissenting) ("The relationship of seller-buyer is
> much different from creditor-debtor."). Often, however, the
> purchaser may, instead of tendering cash, create a separate debtor-
> creditor relationship with the seller. See Official Comm. of
> Unsecured Creditors v. Columbia Gas Sys., Inc. (In re Columbia Gas
> Sys., Inc.), 997 F.2d 1039, 1060 (3d Cir. 1993) ("Typically, . . .
> debtor-creditor relationships are created by contractual agreement
> between two parties.").

180 F.3d at 131 n.1. Accordingly, IGS's obligation to Ultra Litho under the IGS/Ultra

Litho Sale Agreement created a creditor–debtor relationship between Ultra Litho and

IGS.

Further, that creditor-debtor relationship was modified and extended under the

Ultra Litho/IGS Settlement Agreement. Whether the modification of the creditor-debtor

relationship in the Ultra Litho/IGS Settlement Agreement was sufficient to establish an

"extension . . . of credit" under Section 523(a)(2) must be addressed by the standards set

forth in Biondo. In that case, the Court of Appeals addressed at length the terms

"extension, renewal or refinancing of credit" in Section 523(a)(2). With respect to

"extensions" of credit, the Court concluded that:

> [a]n extension of credit is analogous to the classic forbearance
> granted by a creditor in relation to matured debt. Extensions of
> credit under § 523(a)(2) are thus properly viewed as merely an
> agreed enlargement of the time allowed for payment.

180 F.3d at 132.  The Court further concluded that "[t]he terms collectively used in § 523(a)(2) [i.e., "extension, renewal or refinancing of credit"] are thus broad enough to account for virtually every type of secondary debt transaction."  Id. at 133.

Applying these standards to the facts of this case, IGS obtained an "extension . . . of credit" from Ultra Litho, as that phrase is used in Section 523(a)(2), under the Ultra Litho/IGS Settlement Agreement.  That agreement settled and resolved IGS's obligation to Ultra Litho under the IGS/Ultra Litho Sale Agreement, and reduced IGS's obligation to an obligation to wire transfer $127,031.25.  To be sure, Ultra Litho believed that the wire transfer would be made soon after the execution of the Ultra Litho/IGS Settlement Agreement and after IGS signed the Amendment to the Press Agreement, which was somewhat delayed because of the release issue,[9] but IGS's obligation was not "immediate, and theoretically simultaneous" with the execution of the Ultra Litho/IGS Settlement Agreement.  Id. at 131 n.1.

Moreover, as an integral part of the credit extension, IGS also obtained a release from Ultra Litho, as well as from KBA and Jannes.  The importance of the release to IGS and Mr. Moore was established by IGS's own counsel.  In the May 18 Letter, PX 21, from IGS's attorney, Jeffery Axelson, to Mr. Finck, IGS required that a broad release must be inserted into the Press Agreement, under which Ultra Litho, KBA and Jannes each release IGS and its "officers, directors, stockholders [and] employees," among others.  PX 21 at p.1.  As explained by Mr. Axelson in the May 18 Letter, the "specificity

---

[9] As stated in the Findings of Fact, the four parties did not execute the Amendment to the Press Agreement until on or about June 11and 13, 2001.  Mr. Finck did not expect the wire transfer to be made until after the Amendment to the Press Agreement was finalized.

of releasing IGS . . . is paramount to IGS participation in this resolution of the transaction."  Id.

Further, while the receipt of an extension of credit alone is sufficient to meet the threshold predicate of Section 523(a)(2), IGS received more than merely an extension of credit.  It is clear that IGS obtained complete ownership of $150,000 of the Jannes Deposit[10] under the Ultra Litho/IGS Settlement Agreement.  Although the Jannes Deposit was previously delivered to the possession of IGS, even Mr. Moore concedes the Jannes Deposit was, in fact, a deposit, and absent the Ultra Litho/IGS Settlement Agreement, IGS would not have been entitled to those funds. As stated by the United States Supreme Court:

> At most [the term "property"] denotes something subject to ownership, transfer, or exclusive possession and enjoyment, which may be brought within the dominion and control of a court through some recognized process. This is certainly the full extent of the word's meaning as employed in ordinary speech and business and the same significance attaches to it in many carefully prepared writings

Gleason v. Thaw, 236 U.S. 558, 561 (1915) (holding that fraudulently procured legal services did not constitute property for purposes of an exception from discharge under the Bankruptcy Act 32 Stat. 797, 798 (1903)).  Under this analysis, the conversion under the Ultra Litho/IGS Settlement Agreement of the $150,000 portion of the Jannes Deposit from a deposit to an ownership right is certainly "property" within the meaning of Section 523(a)(2).

---

[10] As stated in the Findings of Fact, under the Ultra Litho/IGS Settlement Agreement, IGS was allowed to retain $160,000 of the Jannes Deposit.  However, IGS was required to pay $10,000 into the interest escrow account pursuant to the Press Agreement. Therefore the net "property" received by IGS was the right to ownership of $150,000.

Mr. Moore contends that Ultra Litho did not own the $150,000, and therefore IGS did not receive property <u>from</u> Ultra Litho.  Initially, it is sufficient that IGS received from Ultra Litho an extension of credit.  <u>Biondo</u>, 180 F.3d at 132.  Moreover, Ultra Litho had a sufficient claim against the Jannes Deposit to establish that IGS received a portion of the Jannes Deposit from Ultra Litho.  Once it became clear that Jannes was going to receive a credit from KBA for the Jannes Deposit in the sale between KBA and Jannes, it became incumbent upon IGS and Ultra Litho to work out a resolution of the Jannes Deposit between them.  While the record does not reflect a formal assignment to Ultra Litho of the right to obtain the Jannes Deposit, in fact, Ultra Litho and IGS operated as if, and understood that, the Jannes Deposit was theirs to divide.  Under these circumstances, Ultra Litho had a sufficient stake in the Jannes Deposit that IGS's receipt of $150,000 of it by misrepresentation constituted receiving "property" from Ultra Litho for purposes of Section 523(a)(2)(A).

### 2.    Section 523(a)(2)(A): False Pretenses, False Representation or Actual Fraud.

If the threshold inquiry is answered affirmatively, namely, that Section 523(a)(2(A) applies to the subject debt, a plaintiff must still "prove four elements: (1) a fraudulent misrepresentation; (2) that induces another to act or refrain from acting; (3) causing harm to the plaintiff; and (4) the plaintiff's justifiable reliance on the misrepresentation."  <u>Biondo</u>, 180 F.3d at 134**;** <u>Miller v. Cigna Ins. Co.</u>, 311 B.R. 57, 61 (D. Md. 2004); <u>see</u> <u>also</u>, <u>Spinoso v. Heilman (In re Heilman</u>), 241 B.R. 137, 149 (Bankr. D. Md. 1999) (finding that in order to sustain an action under Section 523(a)(2)(A), the plaintiffs must prove: (1) that the debtor made a representation; (2) that at the time the debtor knew the representation was false; (3) that the debtor made the representation with

the intention and purpose of deceiving the creditor; (4) that the creditor relied on such representation; and (5) that the creditor sustained loss and damage as the proximate result of the representation.); accord, Guaranty Residential Lending, Inc. v. Koep (In re Koep), 334 B.R. 364, 371-372 (Bankr. D. Md. 2005).  Each of these elements will be addressed in turn.

### a.  Misrepresentation

 Ultra Litho must show that Mr. Moore made a misrepresentation.  "A misrepresentation can be any words or conduct which produce a false or misleading impression of fact in the mind of another."  Koep, 334 B.R. at 372 (citing Kendrick v. Pleasants (In re Pleasants), 231 B.R. 893, 897 (Bankr. E.D. Va. 1999)).  A "misrepresentation may be implied by silence."  Household Fin. Corp. v. Kahler (In re Kahler), 187 B.R. 508, 512 (Bankr. E.D. Va. 1995).  "An omission may constitute a misrepresentation where the circumstances are such that the omission creates a false impression which is known by the debtor."  Pleasants, 231 B.R. at 897; Kahler, 187 B.R. at 512.  A misrepresentation may exist notwithstanding the fact that the debtor did not "affirmatively state a misrepresentation or was never asked to disclose pertinent facts." Kahler, 187 B.R. at 512.

In this case, Mr. Moore initially made a misrepresentation by omission, and subsequently made affirmative misrepresentations to Ultra Litho.

In an effort to reach a resolution of the stalled sales contracts, see Findings of Fact at Sections I.2, 3, Ultra Litho, KBA, Jannes and IGS understood that there had to be a resolution of the Jannes Deposit.  The Jannes Deposit had previously been delivered to

IGS and IGS had no right to keep the deposit, other than in its capacity to hold it as a deposit.

Mr. Finck called Mr. Moore after verifying with Jannes that it had sent the Jannes Deposit to IGS.   First, Mr. Finck confirmed with Mr. Moore that IGS had received the Jannes Deposit.   Next, Mr. Finck engaged Mr. Moore in a discussion of how to split up the Jannes Deposit.  The two men agreed on the split that was ultimately embodied in the Ultra Litho/IGS Settlement Agreement.  Mr. Moore knew that Mr. Finck understood that IGS received the Jannes Deposit, he knew that Mr. Finck was attempting to reach a resolution on how to split the deposit, and he knew that there would be no resolution of the overall transaction without a resolution of the Jannes Deposit.  Mr. Moore also undoubtedly knew that if Mr. Finck had knowledge that the Jannes Deposit had been spent and of the severe financial distress that IGS was experiencing at the time, Ultra Litho would have taken other actions to protect itself or reach a different agreement than those embodied in the Press Agreement and the Ultra Litho/IGS Settlement Agreement. Under these circumstances, it was incumbent on Mr. Moore to disclose to Mr. Finck that the Jannes Deposit no longer existed.

Mr. Moore's failure to disclose soon became an affirmative misrepresentation. Mr. Moore had IGS's counsel prepare the Ultra Litho/IGS Settlement Agreement. That agreement contained the following recital:

> WHEREAS, IGS and Ultra Litho wish to settle their differences with regard to the Contract by IGS and the holding of the deposit from Jannes by IGS and allow payment to IGS from said deposit (emphasis added);

The phrases "the holding of the deposit" and "allow payment . . . from said deposit" can only have one meaning: IGS continued to hold the Jannes Deposit.  If Mr.

Moore had simply intended to "settle their differences" with respect to the Jannes Deposit, there would have been no need to include the phrase "holding of the" within the recital. Similarly, the use of the phrase "from said deposit" also would have been unnecessary if the intention was merely to resolve differences concerning the deposit. Accordingly, the Court finds and concludes that the phrases "the holding of the deposit" and "allow payment . . . from said deposit" constitute knowing misrepresentations by Mr. Moore that IGS continued to hold the Jannes Deposit.

Further, the May 18 Letter contained a similar misrepresentation. That letter states that the enclosed draft of the Ultra Litho Settlement Agreement "concerns the transfer of the monies . . . ." "[T]he monies" that were to be "transfer[red]" could only mean the Jannes Deposit, and the statement was an implied representation that IGS continued to hold the Jannes Deposit, when, in fact, Mr. Moore was well aware the funds had been spent.

### b.    Intent to Deceive

Next, the Plaintiff must show that the Debtor made the misrepresentation with intent to deceive.[11] An "intent to deceive may be inferred by the circumstances, including whether the defendant knowingly or recklessly made false representations, which she should know would induce the plaintiff to rely on them." Koep, 334 B.R. at 372; See also, Kahler, 187 B.R. at 513 (finding that "Because direct proof of fraudulent intent is almost impossible to produce, fraudulent intent can be inferred from circumstantial evidence . . . where a person recklessly makes false representations that the

---

[11] The intent to deceive is akin to the intent to induce to act, the second required element of fraudulent misrepresentation. Biondo, 180 F.3d at 134.

person knows or should know will induce another to rely on it, intent to deceive may logically be inferred.") (internal citations omitted)).

The Court finds and concludes that Mr. Moore intended to deceive Mr. Finck into believing that IGS continued to hold the Jannes Deposit.  Mr. Moore knew exactly what Mr. Finck's intentions were: verify that IGS received the Jannes Deposit and reach a resolution with Mr. Moore on how to split it so as to finalize the overall Press transaction. Mr. Moore also knew what none of the other parties knew: that IGS had spent the Jannes Deposit and that IGS was suffering severe financial distress at that time.  This latter fact was evidenced by, among other things, the facts that IGS's business volume had dropped precipitously; a judgment had recently been obtained against IGS by Host; IGS could not pay its storage fees for its assets and therefore could not have access to those assets without payment of those fees; IGS was the subject of numerous lawsuits that would result in at least one other judgment before IGS's demise; and Mr. Moore opened a new bank account for IGS in June 2001. See also, supra, Findings of Fact, Section I.4.  The Court finds and concludes that Mr. Moore did not want Mr. Finck inquiring into IGS's financial position or seeking assurances that IGS could make the payment to Ultra Litho of $127,031.25, as undoubtedly would have happened if Mr. Finck learned that the Jannes Deposit had been spent.  Accordingly, Mr. Moore intended to deceive Mr. Fink into believing that IGS continued to hold the Jannes Deposit.

### c.  Causation

Next, the Plaintiff must show that harm resulted as a proximate cause of the misrepresentation.  "It is axiomatic that in the context of a claim for exception to

discharge under Section 523(a)(2)(A), the harm or damage is the provision of credit."
Biondo, 180 F.3d at 135.

In this case, Ultra Litho has not been paid the $127,031.25 that it was to receive
under the Ultra Litho/IGS Settlement Agreement.  Moreover, Ultra Litho has sold the
Press and relinquished any right to receive a greater amount from Jannes or KBA.  The
Court concludes that Mr. Moore's misrepresentation caused Ultra Litho's loss.

### d.  Reliance

Finally, the Plaintiff must show that he relied on the misrepresentation.  In Field
v. Mans, 516 U.S. 59, (1995),  the United States Supreme Court stated that a plaintiff
must show justifiable reliance rather than reasonable reliance to prevail under Section
523(a)(2)(A).  Justifiable reliance does not mean that the plaintiff's "conduct must
conform to the standard of the reasonable man.  Justification is a matter of the qualities
and characteristics of the particular plaintiff and the circumstances of the particular case,
rather than of the application of a community standard of conduct to all cases."  Id. at 71
(quoting Restatement (Second) of Torts (1976) § 545A, Comment b).  "[A] person is
justified in relying on a representation of fact although he might have ascertained the
falsity of the representation had he made an investigation."  Id. at 70 (internal quotation
marks omitted).  "[T]he plaintiff is entitled to rely upon representations of fact of such a
character as to require some kind of investigation or examination on his part to discover
their falsity, and a defendant who has been guilty of conscious misrepresentation can not
offer as a defense the plaintiff's failure to make the investigation or examination to verify
the same."  Id. at 72 (quoting 1 F. Harper & F. James, Law of Torts § 7.12, pp. 581-583
(1956)).  Nonetheless, a plaintiff is "required to use his senses, and cannot recover if he

blindly relies upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation." <u>Mans</u>, 516 U.S. at 71 (quoting Restatement (second) of Torts (1976) § 541, comment <u>a</u>)

The Court finds and concludes that Ultra Litho in fact relied on the misrepresentations by Mr. Moore. Ultra Litho would not have gone forward with the Press Agreement if IGS had not agreed to enter into the Ultra Litho/IGS Settlement Agreement. Ultra Litho would not have gone forward with the Press Agreement or the Ultra Litho/IGS Settlement Agreement if it had known that IGS had spent the Jannes Deposit.

The Court further finds and concludes that Ultra Litho's reliance on the misrepresentations was justified. There was nothing patently obvious about the misrepresentations by Mr. Moore, or Mr. Finck's understanding of the situation, that would have led Mr. Finck to conclude that IGS had spent the Jannes Deposit. To the contrary, the phone conversation between Mr. Moore and Mr. Finck, coupled with the express language in the Ultra Litho/IGS Settlement Agreement and the May 18 Letter, justifiably led Mr. Finck to conclude that IGS continued to hold the Jannes Deposit. Accordingly, "a defendant who has been guilty of conscious misrepresentation can not offer as a defense the plaintiff's failure to make the investigation or examination to verify the same." <u>Mans</u>, 516 U.S. at 71.

Finally, Mr. Moore contends that Ultra Litho did not rely on the misrepresentations because it ultimately shipped the Press even though IGS failed to pay it the $127,031.25. But Ultra Litho shipped the Press (many months after the documents were executed) because it believed it was contractually obligated to do so. The

appropriate time to determine whether Ultra Litho relied on the misrepresentations is when the agreements were reached and the documents executed. At that time, Ultra Litho had choices over many aspects of the Press transaction, such as to sell the Press at a particular price, to seek assurances from IGS that it could perform or to allow IGS to retain a portion of the Jannes Deposit. Ultra Litho proceeded with the transaction as set forth in the Press Agreement, the Ultra Litho/IGS Settlement Agreement and the Amendment to the Press Agreement in reliance on its belief that IGS continued to hold the Jannes Deposit and would wire those funds as soon as the Amendment to the Press Agreement was finalized. The fact that it later shipped the Press believing it was obligated to do so does not obviate its reliance at the time the misrepresentations were made.

### 3.    Mr. Moore's Subjective Belief That He Could Perform.

Mr. Moore contends that, at the time he negotiated the terms of the Press Agreement, the Ultra Litho/IGS Settlement Agreement and the Amendment to the Press Agreement, and executed the latter two agreements on behalf of IGS, he fully intended for IGS to perform the obligations under the agreements. He contends that he had a subjective belief at that time that he could sell the presses and other assets owned by IGS to generate enough funds to pay Ultra Litho the $127,031.25. He contends that this subjective belief negates any claim of nondischargeability. This Court disagrees.

A debtor's subjective belief that he or she intends to perform the contract is germane in those cases where a debtor has <u>not</u> made an express misrepresentation of a specific fact that provides a basis for a claim under Section 523(a)(2)(A), but where the creditor nevertheless contends that Section 523(a)(2)(A) applies based on the debtor's

alleged implied representation that the debtor intends to perform the contract.  The typical such case is a credit card case – creditors often contend that at the time a debtor charges against the credit card the debtor makes an implied representation that he or she intends to repay the charge.  In such cases, courts scrutinize the debtor's subjective belief that he intended to perform the contract and review objective evidence on whether a debtor could or could not so perform.  See AT&T Universal Card Servs. v. Mercer (In re Mercer), 246 F.3d 391 (5th Cir. 2001); AT&T Universal Card Services Corp. v. Trivisani (In re Trivisani), 225 B.R. 319, 320 (Bankr. D. Md. 1998) (the implied representation in a credit card transaction is that the debtor has an intention to repay the debt.)  In Trivisani, the debtor incurred credit card debts that the creditors sought to except from discharge. The creditor contended that by incurring the debt the debtor made an implied representation that he intended to repay the debt.  In determining whether that representation was false, the court looked to whether the debtor, at the time he incurred the subject debt, had a subjective intention to repay.

In the instant case, however, the Court has found and concluded that Mr. Moore misrepresented that IGS continued to hold the Jannes Deposit, first by omission in his conversation with Mr. Finck, and later by affirmative written misrepresentations in the Ultra Litho/IGS Settlement Agreement and the May 18 Letter.  The Court has also found and concluded that Mr. Moore made these misrepresentations with the intent to deceive Ultra Litho.  Under these circumstances, Mr. Moore's alleged subjective belief that he intended to perform by selling IGS's other assets, paying off storage fees, paying off creditors who were in line to be paid before Ultra Litho, and hoping to have sufficient

funds to pay Ultra Litho (however wistful and unsubstantiated such a belief would have been) is simply not determinative.

Stated otherwise, in the credit card and other similar cases, the misrepresentation that provides the basis for the Section 523(a)(2)(A) claim is the debtor's implied representation that the debtor will perform the contract.  See e.g. Restatement (Second) of Torts (1976) § 530(1) ("A representation of the maker's own intention to do or not do a particular thing is fraudulent if he does not have that intention.").[12]  Obviously, then, in such a case whether or not the debtor in fact had an intention to perform is key to establishing a primary element of a Section 523(a)(2)(A) claim.  In this case, however, where the Debtor made an express misrepresentation that IGS held the Jannes Deposit that Ultra Litho relied on to its detriment, his alleged subjective belief that he could sell other assets and pay Ultra Litho is no defense to the harm to Ultra Litho that resulted from its reliance on Mr. Moore's misrepresentations.

**3.    The Existence of a Debt from Mr. Moore to Ultra Litho.**

Finally, because Section 523(a)(2) excepts from discharge a "debt" obtained by false pretenses or false representations, it goes without saying that the plaintiff must establish that defendant owes plaintiff a debt.  In this case, because the agreements were executed by Mr. Moore in his capacity as an officer of IGS, Ultra Litho must establish that it holds a debt from Mr. Moore for Section 523 to apply at all.[13]

---

[12] See Mans, 516 U.S. at 70 (relying on the Restatement (Second) of Torts to determine the type of reliance required by Section 523(a)(2)(A) "…the most widely accepted distillation of the common law of torts was the Restatement (Second) of Torts…"); Biondo, 180 F.3d at 134 (following Mans in relying on the Restatement (Second) of Torts to determine the elements of Section 523(a)(2)(A)).

[13] The term "debt" means "liability on a claim." 11 U.S.C. § 101(12).  See also 11 U.S.C. § 101(5), providing a broad definition of "claim."

Generally, a corporate officer is not responsible for the contractual debts of a corporation.  See In re Pontier, 165 B.R. 797, 799 (Bankr. D. Md. 1994).  However, a corporate officer "may be held personally liable for his or her own fraudulent conduct committed on behalf of the corporation which causes injury to another."  Id.  See also In re Colodner, 147 B.R. 90, 95 (Bankr. S.D.N.Y. 1992) ("As a 100 percent shareholder of IPM, the debtor had sufficient financial interest in IPM so that the debt owed to the plaintiffs by IPM could qualify as money obtained by the debtor through fraud or false representations for purposes of 11 U.S.C. § 523(a)(2)(A)."); In re Firestone, 26 B.R. 706, 714-15 (Bankr. S.D. Fla. 1982).

In Pontier, plaintiffs filed a complaint alleging non-dischargeability under 11 U.S.C. §§ 523(a)(2)(A), (a)(4) and (a)(6) against the debtor, the sole stockholder of the construction company with whom plaintiffs contracted.  165 B.R. at 798.  In considering whether the debtor could be held liable for the damages alleged, the court stated:

> The debtor's liability on the claim in the instant case is independent of the corporation's liability on its contract with the plaintiffs. The debtor's liability is based solely upon principals of tort law, and therefore arises in addition to any claim for breach of contract the plaintiffs may have against the corporation.

Id. at 801.  The court held that a debtor could be personally liable for a tort committed by a corporation: "[T]o make an officer or corporation liable for the negligence of the corporation there must have been upon his part such a breach of duty as contributed to, or helped to bring about, the injury; he must have been a participant in the wrongful act." Id. at 799.

As explained by the court in <u>Firestone</u>, this is a distinct theory from that of piercing the corporate veil.  In that case, the court found that although the debtor was the sole shareholder of the contracting corporation, there was no need to disregard the corporate entity to find him personally liable. 26 B.R. at 714-15.  The plaintiffs alleged that the debtor, through his companies, Firestone Photographs and Firestone Photo Company, made false misrepresentations in the sale of film distributorships to plaintiffs. <u>Id.</u> at 708-09.   The payments for the distributorships were made by the plaintiffs to the debtor's companies and not to the debtor himself.  <u>Id.</u> at 713-14.  The court went on to find that the monies paid by the plaintiffs for the film distributorships were nondischargeable debts of the debtor under 11 U.S.C. § 523(a)(2)(A), noting that the debtor was not only the owner of the companies, but that he controlled the business operations.  <u>Id.</u> at 714-15, 719 (citing <u>Donsco, Inc. v. Casper Corp.</u>, 587 F.2d 602, 605 (3rd Cir. 1978) (finding shareholder and "central figure" in corporation liable as a participant in the corporation's wrongful act, rather than as an owner of the corporation).

Under Maryland law, "[o]fficers and directors of a corporation generally are insulated from personal liability for the debts of the corporation." <u>Ferguson Trenching Co., Inc. v. Kiehne</u>, 618 A.2d 735, 738 (Md. 1993) (construing Maryland's construction trust statute).  However, an officer of a corporation may be held personally liable for the tort of a corporation if he or she was personally involved in the commission of the tort. <u>Insurance Company of North America v. Miller</u>, 765 A.2d 587, 600 (Md. 2001).  As stated by the Court of Appeals of Maryland in <u>Miller</u>:

> We hold that, under certain circumstances, an officer of a
> corporation may be held personally liable for torts of the
> corporation in which the officer was personally involved.
> As we have said: 'The general rule is that the corporate

> officers or agents are personally liable for those torts which
> they personally commit, or which they inspire or participate
> in, even though performed in the name of an artificial body.
> Of course, participation in the tort is essential to liability.
> If the officer takes no part in the commission of the tort
> committed by the corporation, he is not personally liable
> therefore unless he specifically directed the particular act to
> be done, or participated or cooperated therein.  It would
> seem, therefore, that an officer or director is not liable for
> torts of which he has no knowledge, or to which he has not
> consented.  Thus, e.g., to make an officer of a corporation
> liable for the negligence of the corporation there must have
> been upon his part such a breach of duty as contributed to,
> or helped to bring about, the injury; he must have been a
> participant in the wrongful act.'

Id. (citing Metromedia Co. v. WCBM Maryland, Inc., 327 Md. 514, 520, 610 A.2d 791,

794 (1992) (citations omitted)).

Applying these principles to the facts of this case, the Court finds and concludes

that Mr. Moore is indebted to Ultra Litho in the amount of $127,031.25 as liability on

Ultra Litho's claim of fraudulent misrepresentation against Mr. Moore.  Mr. Moore was

the sole shareholder, President and founder of IGS.  At all times, he was aware of its

financial condition and capabilities.  He alone negotiated and executed each of the

relevant documents on behalf of IGS.  The Ultra Litho/IGS Settlement Agreement was

prepared at his instruction and the cover letter sent by IGS's counsel was sent at Mr.

Moore's request.  Mr. Moore had the telephone conversation with Mr. Finck in which

Mr. Moore did not disclose that IGS had spent the Jannes Deposit.  It is beyond dispute

that Mr. Moore was the primary beneficiary of  $292,500[14]  of the Jannes Deposit that

IGS spent.  Given IGS's rapidly deteriorating financial condition, it was to Mr. Moore's

---

[14] $412,500 less the initial deposit to Ultra Litho of $120,000.

personal advantage to induce Ultra Litho into a resolution of the Jannes Deposit to enable IGS to continue it efforts to survive.

## III.    CONCLUSION

It is true that exceptions to discharge are to be narrowly construed in order to facilitate the "fresh start" policy behind the Bankruptcy Code.  It is equally true, however, that in this case Mr. Moore's company, IGS, received a $412,500 deposit from Jannes, of which it spent $292,500.  Mr. Moore was the direct beneficiary of those funds. When it came time to account for those funds and resolve their ultimate disposition, Mr. Moore first remained silent in the face of Ultra Litho's misunderstanding, and then made affirmative misrepresentations concerning those funds.  Accordingly, for the foregoing reasons, the Court will enter a judgment in the amount of $127,031.25 in favor of Ultra Litho, which judgment shall be nondischargeable pursuant to Section 523(a)(2)(A).


Copies to:

Ultra Litho, Pyt, Limited
c/o Stephen K. Carper, Esq.
Clapp and Carper
One West Church St., 2nd Floor
Frederick, MD 21701

Damon K. Bernstein, Esq.
98 Church Street
Rockville, MD 20850

Jeffrey F. Moore
104 A Bucksfield Drive
Gaithersburg, MD 20878

Rand L. Gelber, Esq.
One Church Street
Suite 802
Rockville, MD 20850

Scott D. Field, Trustee
11921 Rockville Pike, 3rd Floor
Rockville, MD 20852-2743

**END OF MEMORANDUM**